1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

STEVEN BECKER, *et al.*,

10          Plaintiffs,

11      v.

12  ALLCOM, INC., an Alaska corporation, *et al.*,

13

14          Defendants.

15

Case No.  C04-0958L

ORDER REGARDING
CROSS-MOTIONS FOR
SUMMARY JUDGMENT REGARDING
WSSA CLAIM

16

17                    **I.  INTRODUCTION**

18      This matter comes before the Court on cross-motions for partial summary judgment (Dkt.

19  ##80, 96, 145) regarding plaintiffs Steven and Rhonda Becker's claim under the Washington

20  State Securities Act, RCW 21.20 *et seq.* (the "WSSA").  Plaintiffs moved for partial summary

21  judgment regarding their WSSA claims against John and Lola Amyx (the "Amyx defendants")

22  and against defendants Bruce and Susan Scapier (the "Scapier defendants").  The Amyx

23  defendants cross-moved to dismiss the claim.  The Scapier defendants joined the Amyx

24  defendants' motion for partial summary judgment, and plaintiffs filed an opposition to the joint

25  motion.

26      In their motion for summary judgment, plaintiffs also request that the Court dismiss the

27

28  ORDER REGARDING CROSS-MOTIONS
    FOR SUMMARY JUDGMENT - 1

Amyx defendants' indemnity counterclaim.  Plaintiffs filed a separate motion to dismiss the Scapier defendants' indemnity counterclaim.  (Dkt. #81).  Because the motions all relate to the WSSA claim, the Court considers them together.

For the reasons set forth in this Order, the Court denies plaintiffs' motion for summary judgment on the WSSA claim and grants their motions to dismiss the indemnity counterclaims. The Court grants in part and denies in part defendants' motion to dismiss the WSSA claim.

## II.  DISCUSSION

### A.    Background.

In 1995, Becker formed StarCom Technologies, Inc. as a vehicle for creating and marketing a new proprietary data communication technology called Starnet.  The Starnet technology is used for wireless transmission of data.  Becker transferred the rights in Starnet to StarCom Wireless, Inc. ("StarCom").  In an effort to raise capital, StarCom began negotiations with various private investors including Allcom, a privately-held telecommunications company. Bruce Scapier was the president of Allcom during the relevant time period.  John Amyx was an Allcom shareholder and member of its Board.

### 1.    Allcom Agreed to Provide Capital and Assumed Seats on StarCom's Board.

On March 18, 2002, Allcom and StarCom entered into a stock purchase agreement (the "2002 SPA") pursuant to which Allcom agreed to provide financing to StarCom by purchasing nearly 12 million shares of its stock at a fixed price over a five-year period.  See Declaration of Bruce Scapier (Dkt. # 33), Ex. A.  The purchase price was comprised of a cash portion, a debt portion (secured by a five-year note), a conversion of debt owed by StarCom to Allcom, and a portion to be paid to an advisor.  The 2002 SPA also provided that after $1.5 million in capital was raised, $500,000 would be paid to Becker to extinguish StarCom's debt to Becker.  The shares were placed in escrow.  Allcom controlled the voting rights to those shares and received them as it paid for them.  Allcom also received several seats on the StarCom board of directors.

By early 2003, StarCom was experiencing financial difficulties.  It sought additional

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 2

funding from Allcom, though without success.  In February 2003, StarCom took the position that Allcom was in material breach of the 2002 SPA.  All three of Allcom's representatives resigned from the StarCom board in February 2003, then StarCom began merger negotiations with Basic Technologies, Inc.  Allcom, which was still a major StarCom shareholder, opposed the merger.  Allcom and a group of shareholders in Puerto Rico voted against the merger and effectively blocked it.

       **2.**    **The June 2003 Agreements.**

Becker first spoke with Amyx around May 11, 2003; Scapier introduced Amyx as a potential investor for StarCom.  By June 2003, the relationship between Becker and Allcom had further deteriorated and become acrimonious.  Becker alleged that Allcom had defaulted on its obligation to provide financing; Allcom threatened to bring a shareholders derivative suit against Becker.  On June 12, 2003, Becker was given a written stockholder consent document giving Allcom control of the StarCom board and evidencing that Allcom had stockholder control of StarCom.

In an attempt to resolve the disputes, Becker flew to California to meet with Scapier and Stanley Krehbiel, an Allcom stockholder.  Participating via telephone were Amyx and David Morris, who held seats on the Allcom board.  The purpose of the negotiations was to resolve Becker's personal rights arising under previously negotiated agreements, including a voting rights agreement, a consulting agreement with StarCom, and a consulting agreement with Allcom.

Three agreements were signed as a result of the June 2003 negotiations.  Becker signed a settlement agreement on behalf of himself and his mother, Jessie Miller (the "Settlement Agreement").  Declaration of Steven Becker (Dkt. #142) ("Becker Decl."), Ex. 21 (Settlement Agreement).  The Court previously found that Allcom breached the Settlement Agreement and awarded Becker damages.  On June 21, 2003, Becker signed an amendment to the 2002 SPA which gave Allcom majority control of StarCom's board and required Becker to resign as its

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 3

president (the "2003 SPA Amendment").  Becker Decl., Ex. 7.  Allcom also promised to invest up to an additional $5 million in immediately available funding in StarCom by purchasing StarCom's shares.  The third agreement was a June 21, 2003 Termination and Release Agreement (the "Termination Agreement"), pursuant to which Becker agreed to relinquish his rights under a 2002 consulting agreement between him and Allcom.  Becker Decl., Ex. 22.  In the Termination Agreement, Becker released Allcom, and its directors and officers, from liability in exchange for 1 million Allcom stock warrants with an agreed strike price of $1 per share that Becker could exercise at any point over the next ten years.  Becker requested that the parties execute separate agreements so the payments to Becker would not be known to StarCom's other employees.  See Declaration of Bruce Scapier (Dkt. # 33) at ¶ 7.

On February 28, 2005, the Court granted Becker's motion for leave to amend his complaint to add a claim against all defendants under the WSSA.  On March 10, 2005, plaintiffs filed their first amended complaint and alleged that Allcom, the Amyx defendants, and the Scapier defendants violated the WSSA by offering Becker the Allcom warrants in connection with the Termination Agreement while misrepresenting some material facts and omitting others.

**B.    Summary Judgment Standard.**

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court should consider all of the material evidence and determine whether reasonable persons could reach but one conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A court must construe all facts in favor of the non-moving party.  Id. at 255.

**C.    Analysis of WSSA Claim.**

The WSSA, RCW 21.20.010 states in relevant part:

It is unlawful for any person,[1] in connection with the offer, sale, or purchase of any

---

[1] Amyx and Scapier concede for purposes of this motion that they are within the class of persons who may be held individually liable under the WSSA in these circumstances.  See RCW

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 4

security, directly or indirectly:
    (1) To employ any device, scheme, or artifice to defraud;
    (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or
    (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

"Because the primary purpose of the WSSA is to protect investors, it is construed liberally."

Guarino v. Interactive Objects, Inc., 122 Wn. App. 95, 109 (2004).  In analyzing a claim under

the WSSA, courts consider (1) whether a party owed another a duty to disclose or abstain from

the stock transaction, (2) the occurrence of a material omission, (3) upon which the injured party

relied, and (4) who is responsible.  Id.

    **1.      The Indemnity Counterclaims and Ability to Waive WSSA Claims.**

    Defendants argue that plaintiffs' WSSA claim must be dismissed because Becker

expressly released all claims against them.  Defendants also note that pursuant to terms in the

Settlement Agreement, Becker is required to indemnify Amyx and Scapier against Becker's

WSSA claim.[2]

    Plaintiffs rely on Guarino for the proposition that a general release of all claims in a

settlement agreement does not waive WSSA claims.  The Guarino court explained:

> We find no basis for objecting to the inclusion of the stock transaction in the parties' Settlement Agreement.  However, no authority has been cited for the proposition that parties can expressly or implicitly contract away the provisions of the WSSA.  If we held that by merely combining a stock buy-sell agreement with the provisions of the settlement of their unrelated severance compensation dispute, the parties there were not bound by the disclose or abstain requirements [of the WSSA], we would be creating a rule allowing the parties to contract away the protections of the WSSA.  This we will not do.

122 Wn. App. at 123.  In response, the Amyx defendants argue that a later case, also from

---

21.20.430(3).

    [2] The indemnity provision states, "Should any further claim be made arising out of the claims and causes of action herein released, the releasing party will indemnify the released parties from all liability for such claims, including all costs, expenses, and attorneys' fees they incur in defending such claim."  Becker Decl., Ex. 21 (Settlement Agreement).

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 5

1   Division One of the Court of Appeals of Washington, permits parties to waive WSSA claims.

2   See Amyx Defendants' Cross-Motion at p. 17 (citing Stewart v. Estate of Steiner, 122 Wn. App.

3   258, 264 (2004)).  As the Amyx defendants acknowledge, Stewart did not involve a waiver of

4   WSSA claims as part of a general release in a settlement agreement.  Rather, the Stewart court

5   addressed the issue of whether a party's reliance on oral representations is reasonable when he

6   or she has written information to the contrary and explicitly disclaims any reliance on

7   representations outside the agreement.  Stewart, 122 Wn. App. at 261.  Therefore, Stewart does

8   not alter Guarino's statement that a general release of claims does not automatically waive a

9   party's rights under the WSSA.  Accordingly, Becker is not obligated to indemnify defendants

10  for Becker's damages arising out of the WSSA claim, and defendants' counterclaims against

11  Becker for indemnification regarding the WSSA claim must be dismissed.[3]

12        However, based on Stewart, written release and integration clauses are relevant to the

13  determination of whether Becker's alleged reliance was reasonable.  Accordingly, the Court

14  considers the merits of the WSSA claim based on the parties' submissions.

15        **2.    Merits of WSSA Claim.**

16        Plaintiffs argue that Amyx and Scapier misrepresented material facts and failed to

17  disclose others that were relevant to the value of the Allcom stock.  Plaintiffs allege that Amyx

18  and Scapier knew that the following provision in the 2003 SPA Amendment was false: "Allcom

19  has available funds or funding commitments from its shareholders to finance all obligations

20  under this agreement."  Becker also alleges, "It was represented to me that Allcom shares were

21  worth at least $1.00."  Declaration of Steven Becker (Dkt. #83) at ¶ 13.  Plaintiffs further

22  contend that Amyx and Scapier did not disclose the following to Becker: (1) the problems with

23  Allcom's interest in the Nextel Alaska project, including Allcom's default on a $2 million line of

24

25        [3] Plaintiffs' motions present arguments directed towards dismissing the indemnity
26  counterclaim only as it relates to the WSSA claim.  This order therefore does not address the
    indemnity counterclaim as it relates to the other claims in this action.
27

28  ORDER REGARDING CROSS-MOTIONS
    FOR SUMMARY JUDGMENT - 6

credit; and (2) Allcom lacked the funding commitments necessary to accomplish its obligations under the June 2003 agreements.[4] Id.; Plaintiffs' Motion to Dismiss at p. 21. Finally, plaintiffs allege that Scapier did not disclose to Becker that Allcom's 2002 private placement memorandum ("PPM") overvalued Allcom's assets. Becker alleges that he was not aware of these misrepresentations and omissions, and if he had been, he would not have signed the Termination Agreement. Becker Decl. (Dkt. #83) at ¶ 14. Defendants do not dispute that the WSSA applies to them and the securities at issue or that they had a duty to disclose material facts. Rather, they argue that plaintiffs' WSSA claim fails as a matter of law because Becker cannot establish reasonable reliance on any alleged misrepresentation or omission.

"In order to recover damages in an action under the WSSA, normally an aggrieved party must show a right to rely on the representation as made." Guarino, 122 Wn. App. at 118. Where an omission forms the basis for a claim, "positive proof of reliance is not a prerequisite to recovery." Guarino, 122 Wn. App. at 119 (internal citation and quotation omitted). Rather, a rebuttable presumption of reliance is created, which defendant can rebut "by showing that the plaintiff's decision would have been unaffected even if the omitted fact had been disclosed." Id. The Termination Agreement contains an explicit integration clause:

> Integrated Agreement. This Agreement contains the sole and entire agreement between the parties regarding the Consulting Agreement and supercedes any and all other representations, agreements, and understandings between them. Neither party has made any representation with respect to the subject matter of this Agreement to induce its execution except as specifically set forth herein.

See Becker Decl., Ex. 22 (Termination Agreement) at ¶ 5(A).

As the Stewart court noted, the fact that an agreement includes a non-reliance provision is relevant but not dispositive of whether reliance on outside representations was reasonable.

---

[4] Plaintiffs allege various other misrepresentations and omissions in their memoranda; however, the Court considers only the misrepresentations and omissions which Becker states were material to his decision to execute the Termination Agreement. The Court does not consider the additional allegations Becker raised for the first time in his declaration in support of plaintiffs' reply memorandum.

Stewart, 122 Wn. App. at 274.  Courts should also consider the following factors in determining whether one reasonably relied on representations or omissions in connection with the sale of a security:

> (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentation.

Id.  Regarding these factors, the Court finds that Becker was sophisticated regarding financial and securities matters, and he was represented by counsel in negotiating and revising the agreements.  Becker did not have a long standing business or personal relationship with the defendants, and he has denied the existence of a fiduciary relationship.

> ### a.        The Alleged Misrepresentations.

Becker claims that he reasonably relied on the statement in the 2003 SPA Amendment that "Allcom has available funds or funding commitments from its shareholders to finance all obligations under this agreement."  Even if this statement was false, and there is substantial evidence that it was, Becker has insisted that each agreement was separate and distinct, as reflected by the integration clauses, a factor that undermines his claimed reliance on statements in the 2003 SPA Amendment when signing the Termination Agreement.  Also, plaintiffs have not offered a cogent argument of how Allcom's breach of its obligation to fund StarCom would necessarily affect the value of the *Allcom* stock warrants; at best, any such argument is speculative.

Although Becker vaguely argues that he was "led to believe" that the Allcom stock was worth $1 per share, he does not present any evidence that Amyx or Scapier made that representation to him.  Becker has not shown that the statement was false, or that it will be false for the entire ten-year strike period.  Most notably, the Termination Agreement does not refer to Allcom's funding commitment to StarCom or to the stock's value.  In light of the express integration and non-reliance provisions in the Termination Agreement, as well as the application

of the <u>Stewart</u> factors, the Court finds that Becker could not have reasonably relied on the statement in the 2003 SPA Amendment or a $1 stock valuation when executing the Termination Agreement.

### b.    The Alleged Omissions.

The reasonableness of Becker's reliance on the alleged omissions, including Allcom's lack of funding to meet its commitments under the agreements, inaccuracies in the PPM, and problems with the Nextel Alaska project, Allcom's purported largest asset, is a closer call.  The integration clause is much less compelling regarding the omissions.  Also, the WSSA is to be liberally construed and requires that sellers of securities have an affirmative duty to disclose information that a reasonable investor would consider material in his or her investment decision. <u>See</u> <u>Guarino</u>, 122 Wn. App. at 116; <u>see also</u> <u>Nelson v. Serwold</u>, 576 F.2d 1332, 1336 (9th Cir. 1978) (allowing WSSA and federal law claims to proceed based on company's failure to disclose its long-range plans to a stock owner prior to purchasing shares because the plans "would have influenced a reasonable investor's conduct").  In this way, the disclosure requirements of the WSSA go beyond the requirements for negotiating an agreement that does not include the transfer of securities.  In this case, it is likely that a reasonable investor would have considered the omitted information relevant.  Furthermore, disclosure was arguably more important here because the crux of the Termination Agreement and the adversarial negotiation leading up to it was not the transfer of securities but rather resolution of the consulting agreement dispute.  <u>See</u> <u>Guarino</u>, 122 Wn. App. at 123.  However, there is also significant evidence in the record that Becker was aware when he signed the agreements that Allcom's financial situation and its interest in the Nextel Alaska project were shaky.[5]  If Becker was aware

---

[5] For example, in January 2002, Becker received a letter from counsel cautioning against the proposed Allcom-StarCom merger because Allcom potentially had no value and its primary asset, the Nextel Alaska project, was a proposed deal only.  Declaration of Mitchell Broz (Dkt. #98), Ex. A6.  Despite the warnings, Becker did not review any of Allcom's internal financial records, financial statements, profit and loss statements, or documents regarding Allcom's

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 9

1  of the allegedly omitted information or had ready access to that information, his alleged reliance

2  could not have been reasonable.  Accordingly, summary judgment is not appropriate in favor of

3  either party because a genuine issue of fact remains regarding whether Becker's reliance was

4  reasonable in light of the <u>Stewart</u> factors discussed above, the integration clause in the

5  Termination Agreement, and Becker's knowledge of or access to information regarding

6  Allcom's financial health, the accuracy of the PPM, and the status of the Nextel Alaska project.

7  ### III.  CONCLUSION

8      For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART

9  plaintiffs' motions for partial summary judgment (Dkt. ##80, 145).  The Court denies plaintiffs'

10  request for summary judgment on their WSSA claim and grants their request to dismiss the

11  Amyx defendants' indemnity counterclaim against Becker relating to the WSSA claim.  The

12  Court also GRANTS plaintiffs' motion to dismiss the Scapier defendants' indemnity

13  counterclaim against Becker relating to the WSSA claim.  (Dkt. #81).

14      The Court GRANTS IN PART AND DENIES IN PART defendants' motion for partial

15  summary judgment (Dkt. #96).  Plaintiffs may pursue their WSSA claim based on Amyx's and

16  Scapier's alleged omissions of material information; their claim is dismissed as to the alleged

17  misrepresentations.  The Court also STRIKES plaintiffs' two motions to strike (Dkt. ## 136,

18  138) because motions to strike have been abolished, and neither filing complies with the Local

19  Rules regarding sur-replies.

20

21      DATED this 11th day of July, 2005.

22

23      *MM S Lasnik*

Robert S. Lasnik
United States District Judge

24

25  _____

26  corporate structure.  Becker Dep. at 24-25.  Furthermore, Becker was aware of at least one
inaccuracy in the PPM as of February 2003.  Becker Dep. at 107.

27

28  ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 10